[Crim. No. 3936. In Bank.—May 26, 1936.]

THE PEOPLE, Respondent, v. JOHN KELLOGG, Appellant.

Tom Okawara and Gerald H. Catania for Appellant.

U. S. Webb, Attorney-General, and Paul D. McCormick and R. S. McLaughlin, Deputies Attorney-General, for Respondent.

SHENK, J.—The defendant was charged with the murder of Curtis William Hupp on June 9, 1935, in the county of Fresno, and with a prior conviction in January, 1933, in the same county, of second degree burglary, a felony, for which he served a term of imprisonment. He entered pleas of not guilty and not guilty by reason of insanity to the homicide charge, but admitted the prior conviction. He subsequently withdrew his plea of not guilty by reason of insanity. He was convicted of murder of the first degree without recommendation. From the judgment imposing the death penalty and from the order denying his motion for a new trial he has appealed.

The deceased, Hupp, a white man, was last seen alive on Sunday, June 9, 1935, in the company of the defendant, a negro of about 21 years of age. On the afternoon of that day the defendant drove Hupp in the former's Essex automobile twice to the home of Hupp's father-in-law, about three

miles northwest of Fresno, where Hupp's wife was residing. On the first trip Hupp's wife was not at home, but on the second trip Hupp saw and conversed with his wife. There is evidence from which the jury could believe that at that time Hupp had money on his person consisting of silver and a roll of bills at least one of which was of the denomination of ten dollars. About eight days later officers inspected the farmhouse where the defendant lived with his father and sister. They found evidence that blood on the floor of the living room, kitchen, back porch and on the ground in the rear of the house had been partially cleaned away, and that a rug or piece of carpet, a man's hat and a gunny sack had been burned on the ground across the driveway from the house. The defendant was questioned and made five separate statements, three of which were taken down by a phonographic reporter and transcribed. All of these statements appear to have been voluntarily and freely given and without any promise of immunity. It also appears that at all times when he was examined he was fully advised of his rights and that his statements might be used against him. The three written statements were introduced in evidence. In the first the defendant related that when he came into his house alone on the afternoon on Sunday, June 9th, he saw a large cat getting at the meat on the kitchen stove; that he chased the cat around the kitchen, bedroom and living room, and killed it with a stick or bat; that the cat bled profusely and that he carried it by the tail to the rear of the house and wrapped it in burlap, put it in the back of the Essex automobile, and took it to and threw it into an irrigation ditch at Haynes Avenue and Belmont near the city of Fresno. He admitted, however, that he told his sister that he had had a fight with a man; that his sister assisted him in washing the floors and removing blood in and outside of the house, and told him to burn a blood-stained rug, which he did. There was blood on the Essex, and one of the rear side windows was broken. This was explained by the defendant's statement that before he arrived home he drove an intoxicated man to Chinatown, and that as he turned a corner the man bumped his head against the window, breaking it, and that blood from the cuts dripped on the car.

In the second statement the defendant stated that he had had a fight at his home with a colored man by the name of

Clarence, which was instigated by some insulting remarks made by "Clarence" about the defendant's sister; that the blood found on the premises issued from the cuts which "Clarence" received first from a grape knife which the defendant picked up, and then from his use of a stick or bat with which he knocked "Clarence" unconscious; that he dragged him outside and poured water on him to revive him, without success, and then becoming scared, that he wrapped him in burlap and put him, unconscious but still breathing, in the back of the Essex to take him to the hospital, but that "Clarence" revived and started to fight again, whereupon "Clarence" opened the door of the car, alighted and walked away. He admitted, however, that he had told "Jackie", his sister's friend, that he had had a fight with a white man. He also admitted that the story about killing the cat was not true. In this second account he stated that the automobile glass broke when he stopped the car and the fight recommenced, and that this also accounted for the blood on the car.

On June 18th the body of Curtis William Hupp was taken out of the ditch at the location hereinbefore mentioned, in the presence of the defendant, who took the officers to the spot, and who identified the corpse as the body of a man he had wrapped in burlap and thrown into the ditch on June 9th. In the third written statement, made later that day, the defendant admitted that he twice drove Hupp to the latter's father-in-law's residence. He stated that he had not known Hupp before that day; that the deceased offered to put some gas in the defendant's car if he would drive him to his father-in-law's home; that between the two trips to that place Hupp spent his last money for four bottles of beer, and that after the second trip the defendant took him to his own house, where they had some wine; that thereupon Hupp began making improper advances to the defendant which angered him; that Hupp threatened him with the grape knife and that the defendant then ran to the woodbox where he found the stick or bat; that Hupp started to fight and that he (the defendant) then hit him with the bat and "hit him pretty hard"; that Hupp fell down unconscious; that he then dragged the deceased out through the kitchen to the ground, poured water on him to revive him, but failing in this attempt, he then placed a "gunny" sack over his head, put the

body in the Essex, drove to the irrigation ditch and rolled the body into it; that the glass broke by the door flying open and slamming as he was driving away with the body; that he thought the man's first name was "Clarence", but he admitted that it might have been Curtis.

There was testimony from which the jury could conclude that when the body of Hupp was taken from the ditch a watch which he carried was gone; that he had no money on him, and that the pockets of his clothes were turned inside out. In this last statement the defendant denied that he had searched Hupp's pockets. The evidence is conflicting as to whether the defendant had any money on Sunday morning, but there is evidence that he was not paid his wages on Saturday night and that he admitted on Sunday morning that he had no money, although his father testified that he saw five dollars then in his possession, and his mother testified that she had given him $2.50, and there is further evidence that he received $1.80 for some work previously done. There is also evidence that on Sunday evening the defendant paid a garage bill for replacing a bearing that he had "knocked out" that day.

The defendant did not testify on his own behalf. His counsel sought to defend the charge on the theory that the defendant killed Hupp in self-defense. The defendant in his first statement said that he received a cut or scratch found on his back by scraping his back on the bedspring when he crawled under the bed in his chase after the cat. According to another account the scratch was received when "Clarence" threw him against the bed. In the last account the wound was ascribed to the handling of the grape knife by Hupp. Although the defendant claimed to have received cuts on his hands in the fight, there is contradictory evidence that no wounds or cuts except the wound or scratch on his back were seen by those who had occasion to observe him on the same day and succeeding days. His mother testified that she saw fresh blood on his right hand that evening, and the physician who examined the defendant when he was arrested testified that a healed wound or scar on the right wrist and another on the third finger of the right hand could have been inflicted about eight days previously.

The autopsy surgeon testified that the deceased Hupp received five blows on the back of his skull which resulted in

lacerated wounds extending through the soft tissue to the bone, and severe enough to induce unconsciousness, and that those wounds were the cause of death which would have occurred within a few minutes after their infliction; also that there were four wounds caused by blows on the front of the head, and that the sixth cervical vertebra of the neck was fractured; that the blows on the head caused numerous fractures extending all over the skull, and indicated that they were struck by a "blunt angled instrument"; that the fractured vertebra was likely to have been caused by a fall. The body when found was waterlogged, but there was no water in the lungs and no indication that the deceased died from drowning. There was no question of the identification of the body as that of Curtis William Hupp.

The trial court appears to have accorded to the defendant every possible advantage in full and fair instructions on the law of self-defense in homicide cases. No contention is made and under the facts here presented no contention may properly be made that there is insufficient evidence to support the implied finding of the jury that the defendant did not strike the death blows in self-defense. The jury's verdict of guilty of murder of the first degree is also indubitably supported by the evidence, the substance of which has been related. Indeed, no serious contention to the contrary is advanced by the defendant. The motive was indicated as the acquisition of the money and valuables which the jury could have believed Hupp had on his person, and the extent of the punishment was for the jury to determine.

The defendant contends that the court erred in denying his motion to set aside the information made on the ground that he was not legally committed by the magistrate. The preliminary hearing was originally set for July 5, 1935, but was advanced to June 19th on the promise of the officers to release the defendant's father and sister, who were also held. It is insisted that the defendant consented to the preliminary hearing on June 19th without being afforded an opportunity to procure counsel or being furnished with a copy of the complaint or being informed of his legal rights. The record shows that the defendant came into court for the purpose of arraignment on June 20, 1935; and that he was then informed of his rights; that on motion of the attorney appointed to defend him, arraignment was postponed to June

22d; that on June 22d the defendant with his counsel came into court, and that at that time a copy of the information was delivered to the defendant, the reading of which was waived by him, and that the time for entering his plea was continued to June 28th. The record also shows that on July 1, 1935, the defendant with his counsel came into court and entered his pleas, and that July 29th was set as the time for trial. The defendant made his motion to set aside the information on July 12th. The ground upon which an information must be set aside by the court is stated in section 995 of the Penal Code to be that, before the filing of the information, the defendant had not been legally committed by a magistrate. There is no showing that the defendant was illegally committed, or that the defendant was charged without probable cause. The defendant's petition for the writ of *habeas corpus,* made on the grounds now urged, was denied by this court on July 22, 1935. Furthermore, the motion to set aside the information was made after the defendant entered his pleas. No request was made for permission to withdraw the pleas for the purpose of making the motion, and there is no showing of any abuse of discretion on the part of the trial court in denying the motion. (*People* v. *Magee,* 60 Cal. App. 459, 462 [213 Pac. 513] ; *People* v. *Linton,* 102 Cal. App. 608, 611 [283 Pac. 389].)

It is also contended that the trial court erred in sustaining an objection to the following question put to a character witness by the defendant's counsel: "Do you know the general reputation of the deceased, Curtis William Hupp, in the community in which he lived for peace and quiet when Curtis Hupp is intoxicated?" The defendant relies on the case of *People* v. *Lamar,* 148 Cal. 564 [83 Pac. 993], wherein under the facts of that case it was held error for the court to sustain objections to a similar question. In the present case, however, there was no sufficient showing that Hupp was intoxicated at the time, and it further appears that the witness to whom the question was addressed had already answered the question whether he knew the deceased's general reputation in the community for peace and quiet, to the effect that he did not know. In this state of the record there was no harm done to the defendant by the ruling of the court on the further question put to the same witness. We also conclude that there was no error in the trial court's refusal

to instruct the jury that evidence of the bad reputation of the deceased and of his quarrelsome and violent nature had been introduced. The evidence was insufficient upon which to base the proffered instruction.

The judgment and the order denying the motion for a new trial are, and each is, affirmed.

Curtis, J., Thompson, J., Langdon, J., and Waste, C. J., concurred.